**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIA T. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-7855 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| METROPOLITAN WATER | ) | |
| RECLAMATION DISTRICT OF | ) | |
| GREATER CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In her governing second amended complaint [119], Plaintiff Tia T. Taylor ("Plaintiff") asserts claims against her former employer the Metropolitan Water Reclamation District of Greater Chicago ("Defendant" or "District") for Title VII discrimination and hostile work environment based on gender, Title VII retaliation, and FMLA interference and retaliation. This matter is before the Court on Defendant's motion for summary judgment [129], to which Plaintiff has responded *pro se* due to the failure of her retained attorney to respond to any of Plaintiff's communications or orders of the Court. For the following reasons, Defendant's motion for summary judgment [129] is granted in part and denied in part. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's FMLA claims to the extent that Plaintiff requests punitive damages as relief for those claims and on Plaintiff's FMLA interference claim to the extent that it is based on Defendant's alleged denial of leave to Plaintiff in 2015. Defendant's motion is otherwise denied. This case is set for status hearing on May 7, 2020 at 9:30 a.m.

# I.    Background

The following facts are taken primarily from Defendant's Local Rule 56.1 statement [130], which is properly supported by citation to the record in accordance with Local Rule 56.1. Plaintiff has not filed a response to Defendant's Local Rule 56.1 statement, as required by the Local Rules. In particular, Local Rule 56.1(b)(3) requires a party opposing summary judgment to file a response to the movant's 56.1 statement with numbered paragraphs responding to "each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," as well as "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon."

In the ordinary case, even a *pro se* plaintiff's failure to comply with the Local Rules could result in the Court deeming all of the defendant's factual statements admitted. See *Wilson v. Kautex, Inc.*, 371 Fed. Appx. 663, 664 (7th Cir. 2010) (explaining that it is "well within the district court's discretion" to strictly enforce Local Rule 56.1, even where the plaintiff "is a *pro se* litigant"). The Court declines to do so here, however, because Plaintiff is in the position of having to respond *pro se* due to the unexplained disappearance of her retained attorney. Further, since Plaintiff was represented by counsel at the time Defendant moved for summary judgment, she (through no fault of Defendant) did not receive the "Notice to Pro Se Litigants Opposing Summary Judgment" required by Local Rule 56.2, which explains how to respond to a Local Rule 56.1 statement.

The Court has therefore carefully reviewed and considered the factual statements made by Plaintiff in her deposition, see [130-12], and her two responses to summary judgment, [149], [150],

as well as the documents that Plaintiff has filed as an "Appendix," [151]. The Court finds it unnecessary to include all of Plaintiff's allegations and documents in the background section of the opinion, however, given the unwieldy nature of Plaintiff's submissions and the limited number of factual issues on which the disposition of the current motion rests. Instead, in this section of the opinion the Court notes only those disputes that, in its view, are material at the summary judgment stage.

Defendant is a unit of local government, governed by the provisions of the Metropolitan Water Reclamation District Act ("Act"), responsible for sewage treatment and storm water management for an area covering most of Cook County. See 70 ILCS 2605/1 *et seq*. Defendant maintains Anti-Harassment, Anti-Discrimination and Anti-Retaliation Policies and Reporting Procedures ("Administrative Procedure 10.5.0"). The aim of Administrative Procedure 10.5.0 is to provide all employees with a workplace that is free from harassment and discrimination based on things such as an individual's race, sex, gender, color, racial group or perceived racial group, disability, age, religion, national origin or ethnicity, and sexual orientation. This policy intends to provide all employees with a workplace that is free from retaliation for making, or attempting to make, a report, complaint or allegation of harassment or discrimination. The policy intends to eliminate attempts to prevent an employee from participating in these protected activities.

Administrative Procedure 10.5.0 also sets forth a process for progressive disciplinary action. "Progressive disciplinary action may be taken if an employee is found to be in violation of a general or major work rule or for other types of inappropriate or unacceptable conduct. Disciplinary action for employees found to be in violation of these rules will be considered after reasonable investigation, depending on the nature of the offense, previous disciplinary actions and notice to the employee, and any aggravating or mitigating circumstances. Repeated violations of

the same rule or violations of different rules by an employee may result in more severe discipline. Typical disciplinary stages include, but are not limited to: oral warning, written warning, disciplinary suspension without pay, and discharge." [130] at 10-11.

Plaintiff began her employment with Defendant on July 29, 2009 as a Maintenance Laborer B ("MLB"). MLB job duties include landscaping maintenance, pavement sweeping, floor care, window washing, snow shoveling, refuse pick up, other typical janitorial duties, and other duties as assigned.

On November 1, 2013, Plaintiff complained to Defendant that her supervisor, Hollee Davis ("Davis"), harassed her by denying her gas mileage reimbursement, making negative comments about her personal appearance, giving her looks of disgust, and treating her differently than males as far as work assignments. On November 5, 2013, Defendant's Human Resources ("HR") Department conducted an investigation into Plaintiff's claim. HR's investigation consisted of interviews with Davis, Davis' supervisor George Kedl, and Plaintiff, as well as an examination of the MLB work log assignments. As a result of the investigation, in order to correct an unequal distribution of work, the workloads of both Plaintiff and a male co-worker, Franklin Enyard ("Enyard"), were reduced. HR did not find that Davis discriminated against Plaintiff or harassed Plaintiff. HR concluded that there was no evidence to show that Davis' actions violated Administrative Procedure 10.5.0.

In 2014, Plaintiff was allegedly harassed on two occasions by her co-worker Enyard. At her deposition, Plaintiff testified that the first incident, which occurred on April 28, 2014, began when she went to the digester building to ask Enyard for the key to a cart that she wanted to use to complete her work. Plaintiff testified that Enyard "just started going crazy" and "cornered [her] off and was walking up in [her] face and pumping [her] with his chest." [130-12] at 16, Tr. p. 54.

Plaintiff stated that Enyard was "enraged," "foaming at the mouth," with "[s]pit … flying out of his mouth." *Id*. Enyard allegedly told Plaintiff: "Oh bitch, you think you're all that. Oh, I can— I'll make you suck my dick. Bitch, you walking around here thinking you're all that. You ain't all that, bitch. Who the fuck do you think you are? I'll kill your mother fucking ass." *Id*. Plaintiff testified that once Enyard cornered her, she "started to fear that he was really going to do something." *Id*. at 17. According to Plaintiff, this was not the first time she had seen Enyard "going into these rages," but was "shocked that it was towards me." *Id*. at 16.

 Plaintiff filed a complaint with HR concerning the incident. HR began its investigation of the incident the next day. Plaintiff was interviewed by an HR investigator.

While Plaintiff's allegations were under review, Defendant promoted Plaintiff to the position of Maintenance Laborer A ("MLA") at the Egan Plant effective May 5, 2014. However, due to an error discovered on May 7, 2014, Defendant determined that it had used an incorrect seniority date to determine Plaintiff's eligibility for promotion to MLA. As a result of correcting her seniority date, Plaintiff was not eligible for appointment under the terms of the governing collective bargaining agreement with SEIU Local 1, Fireman and Oilers Division. To correct this error of promoting Plaintiff from MLB to MLA too early due to seniority and to comply with the collective bargaining agreement, Plaintiff's appointment was rescinded by the Executive Director on May 7, 2014. Defendant instructed Plaintiff to report to her original MLB classification at the Calumet Plant on Friday, May 9, 2014.

On May 22, 2014, HR issued its report concerning the April 28 incident. According to the report, Plaintiff made the following statements during her interview regarding what happened on the morning of April 28, 2014: Plaintiff noticed a cart parked outside the digester building, entered the building and knocked on the door of the men's room. When Enyard came out; she told Enyard

that she wanted to use the cart when he was through, to which he replied, "Fuck you. Use your own car (sic)." Plaintiff admitted that she replied in the same way, at which point Enyard said "you ain't using shit. Fuck you bitch. Suck my motherfucking dick." Plaintiff stated that although she initially reacted to Enyard's outburst by arguing with him, she realized he was so upset that she decided to cease her side of the argument. Plaintiff stated that Enyard's face was within a foot of hers and that he was spraying spittle in her face as he was shouting profanities at her as he yelled, "Fuck you bitch. I'll make you suck my dick. I'll kill you." Plaintiff claimed that Enyard was bumping into her chest, and cornered her against the wall, until subsequently both employees walked down the hall and Plaintiff exited through a door that she pushed open to get away. [130] at 7.

HR's report also recounts its interview with Enyard. According to the report, Enyard stated as follows: On the morning of April 28, 2014 Enyard was working in the men's room in the digester building when he heard a knock on the door and Plaintiff stuck her head in the door, entered the men's room and said "I'm taking the cart" to which he replied "I don't think so." Enyard denied ever swearing at Plaintiff, stating that it was "inappropriate to cuss at a female," and declared that such behavior would be offensive to him. Instead, Enyard stated that when Plaintiff approached him for the cart he told her "you need to leave me alone. This is inappropriate. There is a procedure for requesting the cart." Enyard denied ever touching or threatening Plaintiff. Enyard admitted that he and Plaintiff were both talking loudly to one another in the hallway and Enyard stated that Plaintiff said "she was going to fix me, get me in trouble." [130] at 8.

Following its investigation, HR determined that Plaintiff instigated the confrontation with Enyard. HR's decision was based on the following facts: Plaintiff went to the digester building for the cart, which was far out of the way of where Plaintiff was scheduled to work; Plaintiff

admitted swearing at Enyard at the beginning of the incident; another employee, Ms. Sullivan, told HR that she witnessed Plaintiff call Enyard a "coward" upon encountering him in the hallway outside the Laborer foreman's office after the incident; and subsequently Plaintiff told the responding police officer Esposito that "she felt safe to return to work," which HR found contradicted Plaintiff's claim that she feared for her life. HR concluded that Plaintiff initiated the incident by confronting Enyard over the use of a cart, behaving inappropriately, becoming argumentative and swearing at her co-worker.

The second time Plaintiff allegedly was sexually harassed by Enyard occurred on May 30, 2014. According to Plaintiff, Enyard allegedly entered a room that she was vacuuming, said "hmm, and went to say the word 'bitch,' but [Plaintiff] started yelling for help and ran away before Enyard could say anything else." [130-12] at 70, Tr. p. 190.

Defendant investigated this second incident on June 2, 2014 and issued an investigative report on June 13, 2014. The report states that Plaintiff's department contacted HR as soon as the potential seriousness of the alleged incident was discovered and made attempts to keep Plaintiff and Enyard separated and working in different areas to the best of their ability.

On June 4, 2014 (while the investigation of the June 2 incident was pending), Defendant promoted Plaintiff to the position of Maintenance Laborer A ("MLA") at a different job site, the Kirie Plant. On June 13, 2014, HR issued a report concluding its investigation into the May 30 incident between Plaintiff and Enyard. According to the report, Enyard entered an office where Plaintiff was working and gave her a "smug" look, whereupon Plaintiff went into a hallway and began shouting, went to her supervisor's office, and eventually called the Chicago Police. HR determined that Plaintiff's and Enyard's behavior in both of these incidents was unacceptable. The report concluded that behavior exhibited by both Plaintiff and Enyard violated aspects of

Administrative Procedure 10.27.0 and therefore recommended that both employees receive written warnings and be counseled on appropriate work behavior and ways to more appropriately address similar problems in the future.

On July 11, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging harassment based on gender and retaliation. In the particulars to her charge Plaintiff alleges, "I began employment with Respondent on or about July 29, 2009 and my current job classification is Maintenance Laborer 'A'. During my employment, I have been subjected to different terms and conditions of employment, which includes, but is not limited to, being harassed, sexually harassed, threatened and assaulted. I complained and was demoted in or around May 2014. I believe I have been discriminated against because of my sex, female, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended." [130] at 3.

On August 18, 2014, Defendant issued Plaintiff an Employee Warning Notice due to the April 28, 2014 incident between her and Enyard. Enyard was also issued a warning, and both employees were advised that further violations of Defendant's rules, policies or administrative procedures may result in additional discipline.

On June 10, 2015, the EEOC issued a Dismissal and Notice of Rights to Plaintiff for EEOC Charge No. 440-2014-04172.

On August 29, 2015, Defendant issued Plaintiff an oral warning for two spills that allegedly occurred due to her actions during time periods of heavy flow on August 3, 2015 and August 10, 2015. As explained in more detail in the analysis section below, Plaintiff disputes that she was responsible for the spills. Defendant determined that Plaintiff's conduct violated Administrative Procedure 10.27 Rule 1(a). The documented oral warning directed Plaintiff to "remain cognizant

of your work area surroundings and conditions, and duties, take necessary actions when required, and follow instructions," and warned that future violations of the policy would result in further disciplinary action. [130] at 11.

Plaintiff filed her complaint in this case on September 4, 2015.

On November 9, 2015, Defendant issued Plaintiff a one-day suspension without pay as a result of an investigation which determined that on September 8, 2015, Plaintiff made a threat to her supervisor, Ramone Adams ("Adams") that she would make a false allegation against him and that she would "make it stick." [130] at 18. The suspension notes that this threat occurred during a discussion regarding the August 29, 2015 oral warning Plaintiff received and was also made in the presence of the supervising Treatment Plant Operator III. At her deposition, Plaintiff denied ever threatening Adams.

On December 1, 2015, Defendant issued Plaintiff a three-day suspension due to her alleged repeated refusals to fill out an Employee Sick Leave Report for when she called in sick on November 18, 2015. On May 19, 2016, Defendant issued Plaintiff a five-day suspension for allegedly refusing her supervisors' repeated requests to complete an Unscheduled Absence Report for coming in late to work on March 24, 2016, despite being warned she could be investigated for insubordination for her refusal. At her deposition, Plaintiff denied that she refused to fill out any forms.

Plaintiff's overall Performance Review for the one-year period ending June 3, 2016 was "Improvement Required" and documented deficiencies in the categories of "Work Output," "Cooperation," and "Job Knowledge." [130] at 14. This Performance Review contains comments on Plaintiff's attendance, documenting 48 hours of suspension for the alleged threat to Adams and insubordination related to her refusals to complete an Employee Sick Leave Report and

Unscheduled Absence Report. The overall comments for this Performance Evaluation also note the August 29, 2015 oral warning Plaintiff received for allegedly failing to properly maintain her work area on two occasions.

Plaintiff's overall Quarterly Evaluations for June 4, 2016 to September 3, 2016 and December 4, 2016 to March 3, 2017 were both "Meets Standards."

On April 17, 2017, Plaintiff requested intermittent FMLA leave to care for her mother and was sent FMLA paperwork. HR is responsible for administering the provisions of the FMLA and ensuring that employees are aware of their rights and responsibilities. Plaintiff submitted FMLA paperwork on May 11, 2017. Plaintiff's fully completed FMLA paperwork was received around June 2, 2017. Defendant approved Plaintiff for FMLA leave on June 7, 2017, but it was retroactive initially from May 11, 2017 through May 10, 2018. May 20, 2017 was the first day Plaintiff used FMLA leave during her FMLA approval period. Therefore, in accordance with District policy, Plaintiff's FMLA eligibility period was changed to May 20, 2017 through May 19, 2018. The District ultimately approved FMLA leave for Plaintiff on May 20, 2017. Plaintiff's FMLA application had deficiencies with the attached physician certification. On June 28, 2017, Defendant confirmed final approval of Plaintiff's request for Intermittent FMLA Medical Leave for her mother from May 20, 2017 through May 19, 2018.

On June 8, 2017, Defendant issued Plaintiff a five-day suspension for being AWOL for 4.25 hours on May 14, 2017 and 8 hours each day on May 21, 25, and 26, 2017 and for failing to provide medical documentation substantiating her need to take sick time. Plaintiff disputes that she committed such infractions and maintains that she requested FMLA leave for May 21, 25 and 26, 2017 and provided her supervisor with FMLA paperwork. HR conducted an investigation into Plaintiff's alleged AWOL absences for May 21, 25, and 26, 2017. According to Defendant, during

the investigation and pre-disciplinary meetings, Plaintiff did not request that these days be covered by FMLA. HR determined that Plaintiff called in late three- and- a- half hours into the shift on May 14, 2017 and was AWOL for 4.25 hours on May 14, 2017, and AWOL on May 21, 25, and 26, 2017. HR also concluded that Plaintiff never stated that she wanted to use FMLA time for her absences on May 21, 25, or 26, 2017 and did not provide a medical certification explaining any of those absences. Ultimately, the May 20, 2017 date that was coded AWOL was changed to FMLA-approved.

William White, Treatment Plant Operator III, testified at Plaintiff's later termination hearing that he received a phone call from Plaintiff on May 19, 2017. According to White, Plaintiff asked him for May 20, 2017 off, requesting a vacation day, but White informed Plaintiff that her attendance was required at a meeting with her supervisors. Plaintiff then requested sick time and informed White they will probably "10" me (AWOL time is code 10) but informed White that she had FMLA paperwork that would correct the issue. Charles Svazas, Treatment Plant Operator III, testified at the later termination hearing that he received a phone call from Plaintiff on May 24, 2017. Plaintiff requested a vacation day on May 25, 2017; however, when Svazas could not approve a vacation day she changed her request to one for sick time. Plaintiff did not mention anything about FMLA or caring for her ailing mother. Svazas received another phone call from Plaintiff on May 25, 2017, again requesting a vacation day for May 26, 2017. Plaintiff did not mention anything about FMLA or caring for her ailing mother. (Plaintiff disputes that did not mention FMLA when she called in on May 21, 25, and 26, 2017.)

After receiving the five-day suspension, Plaintiff received her Performance Review for June 4, 2016 to June 3, 2017. Her overall rating was "Improvement Required." The review documented deficiencies in the categories of "Job Knowledge" and "Compliance with Work

Schedules" and noted 28.25 hours AWOL on May 14, 21, 25, and 26, 2017 and the five-day suspension on June 19, 20, 21, 22, and June 25, 2017.

Plaintiff appealed her rating through her chain of command and eventually to HR. Plaintiff alleged that her rating was due to harassment and that she received the five-day suspension after she was denied FMLA leave and subsequently marked AWOL. Representatives from HR were assigned to investigate Plaintiff's appeal, and as part of that investigation they interviewed Plaintiff, her chain of command, and also reviewed relevant documents. Based on the performance appraisal appeal and the findings of the investigation, it was determined there was no evidence to substantiate that Plaintiff's performance rating was due to harassment in accordance with Administrative Procedure 10.5.0. The investigation of Plaintiff's appeal determined that Defendant issued Plaintiff a five-day suspension for being marked AWOL, which Plaintiff did not appeal. The investigation also determined that Defendant approved Plaintiff for FMLA effective May 20, 2017 in accordance with District policy. The Director of HR determined that Plaintiff's performance appraisal for the period June 4, 2016 to June 3, 2017 should remain unchanged with an overall rating of "Improvement Required."

On June 27, 2017, Plaintiff filed her amended complaint in this case.

On September 19, 2017, Defendant suspended Plaintiff for thirty days pending discharge, for the period from September 28 through October 27, 2017. Pursuant to Section 4.14 of the Act, suspensions shall not exceed thirty days; however if charges are filed against a suspended employee, the suspension shall be extended until the Civil Service Board enters its finding and decision regarding the charges. See 70 ILCS 2605/4.14. The suspension notice stated that Plaintiff was suspended pending discharge due to her failure to maintain the minimum standard of performance as determined by her performance appraisal ratings. It also noted that although

Plaintiff appealed her performance ratings, both her chain of command and the Director of HR declined to make any changes to her ratings based on the findings of the investigation. Defendant's suspension cited Defendant's Personnel Rule 11.041, which provides, in part, that an employee may be discharged from the District if the employee is found by the Civil Service Board to: (2) have failed to maintain the minimum standard of performance as determined by a service rating; (4) have violated any of the provisions of the Act, the Personnel Rules, Defendant's Administrative Procedures Manual, the provisions of applicable collective bargaining agreements, or any official regulation of the Executive Director, Board of Commissioners or orders of the Civil Service Board, or have disobeyed any proper order or directions made or given by any superior officer of the District; (7) be unable to comply with any condition of employment established by the Executive Director, Board of Commissioners or the Director of Human Resources; (8) have been absent from his or her post of employment without authorized leave; or (9) have been guilty of any conduct which tends to render the employee's continued employment detrimental to the discipline, efficiency, or reputation of the District.

On December 4, 2017, Plaintiff contacted HR to ask why she did not receive FMLA leave for May 21, 25, or 26, 2017. The Director of HR provided the following response: "On May 21, 2017 you called in for sick leave for May 21, 2017, code 0050, and were advised you would need documentation. You failed to provide any documentation. Additionally, you did not request FMLA leave for this absence. On May 25, 2017 you called in for vacation for May 25, 2017, code 0060, since you believed there was extra coverage. However, this request was denied and you were required to report for work. You then stated that you would not be coming into work. Additionally, you did not request FMLA leave for this absence. On May 26, 2017 once again you called in for vacation for May 26, 2017, code 0060, since you believed there was extra coverage.

However, this request was denied and you were required to report for work. You then stated that you would not be coming into work. Additionally, you did not request FMLA leave for this absence. Therefore, you were marked code 0010, Absent Without Leave (AWOL) for these absences." [130] at 20.

On December 20, 2017, Defendant filed amended charges with Defendant's Civil Service Board seeking Plaintiff's termination. Defendant's amended termination charges attached Plaintiff's thirty-day suspension notice and requested that the Civil Service Board discharge Plaintiff for violations of Defendant Personnel Rule 11.041 (2), (4), (7), (8), and (9). Defendant's Civil Service Board consists of three members appointed by Defendant's Board of Commissioners to hear and decide employment-related matters regarding employees of Defendant, including discharge cases. The final administrative decisions of the Civil Service Board are subject to the Illinois Administrative Review Law.

The Act provides that no employee in Defendant's classified civil service shall be discharged except for cause, upon written charges, and after an opportunity to be heard in her own defense. Plaintiff's discharge hearing occurred before the Civil Service Board on January 17, 2018 and January 25, 2018. Plaintiff had the opportunity to present evidence and to call witnesses on her behalf. Defendant presented the following witnesses: Robert Byrne, Senior H.R. Analyst; Joseph Cummings, Managing Engineer; Ramone Adams, Associate Civil Engineer; Robin Felton, H.R. Analyst; Michael Kavanaugh, Treatment Plant Operator II; William White, Treatment Plant Operator III; and Charles Svazas, Treatment Plant Operator III. Defendant also presented 25 exhibits, which the Civil Service Board admitted into evidence. Plaintiff testified. She did not call any other witnesses, but presented two exhibits, which the Civil Service Board admitted into evidence.

At the hearing, Cummings and Adams testified that Plaintiff failed to maintain her work area, causing two spills on August 3, 2015 and August 10, 2015.  As explained below, Plaintiff disputes that she was responsible for either spill.  According to Cummings, Plaintiff's misconduct and discipline were "extremely disruptive to say the least…. It's not good for morale of the plant when there's somebody that is always blaming others for the things that she has done herself." [130]  Adams also testified that Plaintiff threatened to make false allegations against him and to "make it stick" [130] at 18.  Adams further testified that Plaintiff refused to complete an Employee Sick Leave Report and also refused to fill out an Unexcused Absence Report.  Plaintiff denies that she threatened Adams or refused to fill out the required forms.

On April 10, 2018, the Civil Service Board rendered a decision terminating Plaintiff's employment with Defendant.  The Board's decision states that since Plaintiff passed probation as an MLA, she had received the full gambit of disciplinary actions, from two oral warnings to the pending discharge proceeding.  Her alleged infractions included: failure to clean up spills in her assigned work area; threatening her supervisor that she would make a false allegation about him; multiple counts of insubordination; refusal to complete required documents such as an Unscheduled Absence Report; and being AWOL.  The Board's decision stated that evidence and testimony showed that Plaintiff had been given numerous opportunities to correct her behavior and to improve her work performance, but she failed to do so.  The Board opined that "Plaintiff's credibility was diminished during the hearing as she was impeached, without rehabilitation, by the District using her own documents.  For example, several times during the hearing Plaintiff claimed that the District did not investigate her claims of harassment, only to be impeached on the stand during cross examination using the documents she tendered during discovery"  [130] at 18-19.

The Board noted Plaintiff's lack of support, lack of independent evidence, and "diminished credibility as a witness." *Id.* at 19.

The Civil Service Board's termination decision also noted Plaintiff's "wealth of knowledge" concerning the FMLA and found "limited merit" to the question of whether the District had failed in some aspect but instead concluded that any such failure was deemed remedied when the District reclassified her attendance on May 20, 2017 from AWOL to FMLA. "Given the extensive testimony provided by the District, with no reasonable or independent evidence or testimony offered by Plaintiff to the contrary, the Board was unmoved by her claim that she requested to use FMLA for May 21st, 25th and 26th, 2017." [130] at 21.

On May 9, 2019, Plaintiff filed her governing second amended complaint ("SAC") [119], which consists of five counts: 1) Title VII discrimination based on gender; 2) Title VII hostile work environment based on gender; 3) Title VII retaliation; 4) FMLA interference; and 5) FMLA retaliation.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705-06 (7th Cir. 2019).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III.    Analysis

### A.    Title VII Gender Discrimination

In Count I of the SAC, Plaintiff alleges that Defendant discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (2012). To survive summary judgment on a Title VII

discrimination claim, a plaintiff must come forward with evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); see also *Madlock v. WEC Energy Group, Inc*., 885 F.3d 465, 470 (C.A.7 (Wis.), 2018); *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "[A] materially adverse employment action is one which visits upon a plaintiff "a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). "For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bell v. E.P.A*., 232 F.3d 546, 555 (7th Cir. 2000). The adverse action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). In other words, "not everything that makes an employee unhappy is an actionable adverse action." *Id.*

In her responses to summary judgment, Plaintiff identifies multiple events that she believes constituted adverse employment actions. However, it is unnecessary for the Court to consider each action independently, because the first action identified by Plaintiff—being given a substantially heavier workload than her male co-workers because she was a woman—is sufficient to allow Plaintiff's Title VII discrimination claim to go forward.

Defendant argues that the alleged uneven work distribution does not constitute an adverse employment action because the MLB job description includes janitorial duties and does not differentiate between male and female tasks. According to Defendant, the alleged uneven work distribution does not amount to a significant change in Plaintiff's employment status and instead

is properly characterized as a mere inconvenience or petty slight. Defendant also argues that there is no evidence that this, or any other employment action taken against Plaintiff, was motivated by gender-related discriminatory animus.

These issues cannot be resolved on summary judgment. The Seventh Circuit has explained that, "[a]bsent evidence suggesting that discrimination motivated work distributions, the mere fact that an employee … had a heavier workload than her co-workers does not amount to an adverse employment action." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th 2007); see also *Haugerud v. Amery School Dist.*, 259 F.3d 678, 695 (7th Cir. 2001) ("even if the [employer] has a contractual right to impose additional duties on plaintiff, this right is not absolute; Title VII would not permit the [employer] to increase plaintiff's workload due to her sex"). Here, Plaintiff has come forward (albeit not in the manner required by the Local Rules) with evidence that her supervisor, Davis, assigned her more work than her male colleagues and did so expressly because Plaintiff is a female. At her deposition, Plaintiff testified that Davis assigned her "my work load as well as the male's workload while they sat in her office drinking coffee gossiping[.]" [130-12] at 7, Tr. p. 21. She also testified that beginning in April 2010, Davis required her to clean areas that four male employees—Enyard, Fred Smith, Andre Thompson, and Joe Smith—were assigned to clean. According to Plaintiff, Davis told her that "she got complaints" about the male employees "not doing the work, and she explained that the men clean like men and that [Plaintiff] cleaned really well, if [Plaintiff] could go over and clean their areas because they didn't clean it properly." *Id.* at 6, Tr. pp. 14-15. Plaintiff further testified: "[Davis] harassed me by threatening me with disciplinary action if I questioned about why I couldn't do—why the men couldn't do their work. She would then say, oh, well, they clean like men. You clean good. Yeah, just go over and do it because they're going to get me written up. That's harassment because she should have been

telling them to do their job instead of having me to do their job." *Id*. at 14, Tr. p. 49. The Court may not judge the credibility of Plaintiff's testimony; this is the role of the trier of fact. See *Johnson*, 936 F.3d at 705.

Apart from Plaintiff's testimony, Defendant acknowledges that, following a complaint from Plaintiff in November 2013, HR investigated, determined that there was an unequal distribution of work, and reduced the workloads of both Plaintiff and Enyard. This is consistent with Plaintiff's testimony that Davis assigned her more work than male maintenance workers, which Plaintiff claims was because of her gender. Given these factual disputes, Defendant is not entitled to summary judgment on Plaintiff's Title VII discrimination claim.

**B.      Title VII Hostile Work Environment Based On Gender**

In Count II of the SAC, Plaintiff alleges that Defendant, "through its agents and by its actions and/or omission created a hostile work environment for [Plaintiff] based on her gender." [119] at 27. Title VII prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). "An employer violates this provision when 'discrimination based on sex ... create[s] a hostile or abusive work environment.'" *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

"To establish a hostile work environment claim, a plaintiff must show that she was '(1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that

were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability.'" *Costco*, 903 F.3d at 625 (quoting *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008)). The third factor "requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). The court evaluates the severity and pervasiveness of the alleged hostile work environment based on the "totality of the circumstances," which includes (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011).

With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." See 29 C.F.R. § 1604.11(d). For purposes of determining employer liability for Title VII harassment cases, a "supervisor" is limited to those who are empowered by the employer to take tangible employment actions against the employee. *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). To establish harassment based on the actions of a nonsupervisory employee, the plaintiff bears the burden of proving the employer's negligence in order for the employer to be liable for the harassment. *Id.* at 448-49; see also *Zimmerman v. Cook Cty. Sheriff's Dep't*, 96 F.3d 1017, 1018 (7th Cir. 1996) (to establish "liability of an employer for sexual harassment by one nonsupervisory employee of another," "[t]he plaintiff must prove that the employer was negligent in having failed to discover and prevent it"). When the plaintiff claims that a co-worker harassed her, an employer can be liable only if it was negligent either in discovering or remedying the harassment. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952

(7th Cir. 2005). The reasonableness of the employer's response "depends on the gravity of the harassment": "an employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment than to protect them from trivial harassment." *Baskerville v. Culligan Int'l Co*., 50 F.3d 428, 432 (7th Cir. 1995).

Plaintiff's hostile work environment claim is based on the alleged harassment she encountered from her supervisor, Davis, and her co-worker, Enyard. In this opinion, the Court finds it necessary only to examine the alleged harassment by Enyard. Defendant argues that it is entitled to summary judgment because Enyard's alleged conduct was not severe or pervasive and there is no basis for employer liability. However, neither of these elements of Plaintiff's hostile work environment claim can be resolved on summary judgment.

"Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (quotation marks and internal citation omitted). The required standard "may be met by a single extremely serious act of harassment or by a series of less severe acts." *Id.* Although neither party cites any on-point case law, the Court concludes that, viewing the record in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Enyard's alleged threat to kill Plaintiff was "extremely serious," especially when coupled with his alleged "physically threatening" actions of chest-bumping Plaintiff and backing her into a corner while screaming at her, calling her a bitch, and telling her that he would make her "suck his dick." *Ellis*, 650 F.3d at 647; compare *May v. DaimlerChrysler Corp*., 2006 WL 6656531, at *2 (N.D. Ill. Sept. 26, 2006) (defendant employer was not entitled to summary judgment on plaintiff's Title VII hostile work environment claim where plaintiff came forward with evidence that his property at defendant's plant had been damaged and covered with graffiti and notes including "death to the Cuban Jew";

"Hang the fucken (sic) Cuban Jew"; "Fuck Otto and all Jews/kill them all/Hitler did not finish it but we will/death to the Jews/Heil Hitler"); *Seiwert v. Spencer-Owen Community School Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007) (genuine issues of material fact existed as to whether harassment allegedly suffered by male eighth-grade student, including being called "faggot," being kicked by several boys during dodge ball game, and receiving death threats, constituted sex-based discrimination, precluding summary judgment in Title IX action). Defendant has not identified any cases in while similarly serious behavior has been deemed insufficient, as a matter of law, to support a hostile work environment claim.

A reasonable factfinder also could conclude that Defendant is liable for Enyard's alleged harassment due to a failure to take corrective action that was both "immediate *and* appropriate." See 29 C.F.R. § 1604.11(d) (emphasis added); cf. *Jarman v. City of Northlake*, 950 F. Supp. 1375, 1379 (N.D. Ill. 1997) (city employee's allegation that city had delayed five month after employee first complained about sexual harassment by city alderman before it took corrective action in passing ordinance prohibiting sexual harassment of employees by elected officials was sufficient, for pleading purposes, to establish that city had failed to take "immediate" corrective action).

The HR investigative report that Defendant has included in the record, viewed in the light most favorable to Plaintiff, undercuts Defendant's assertion that its response was sufficiently "immediate" given the gravity of Plaintiff's claim that Enyard threatened to kill her. According to the report, Plaintiff reported the incident in writing on the morning of April 28, but "it was not until [Plaintiff]'s report of the … incident was read by her supervisor at approximately 3:00 p.m. that he learned of [Plaintiff]'s allegation." [130-5] at 96. The report states that "[h]ad that allegation been discovered on the morning of April 28, when the incident was first reported, the

investigation could have started a day sooner and [Plaintiff] may not have had to approach multiple supervisors or the District police." *Id*.

The HR report also states that Defendant "did appropriately contact the HR Department as soon as the potential seriousness was discovered and has made attempts to keep the employees separated and working in different areas to the best of their ability and handled the second incident adeptly." [130-5] at 96. However, the immediacy and appropriateness of Defendant's response is disputed—particularly whether Defendant made sufficient (or any) attempts to separate Plaintiff and Enyard while Plaintiff's complaint was being investigated. Plaintiff testified at her deposition that Enyard was "back at work the next day laughing about the situation," and "everybody was just carrying on like nothing happened." [130-12] at 17, Tr. p. 58. Plaintiff also asserts in response to summary judgment that after she reported Enyard, "no preventive measures were taken to prevent future harassment, Enyard and Taylor signed the same time sheet, worked the same shift, under the same supervisor (Davis) daily." [149] at 7 (citing [151] at 148 (Plaintiff's Ex. C-19, an undated time sheet).

The fact that Plaintiff had another incident with Enyard on May 30 lends credence to her assertion that no effective measures were taken to keep Plaintiff and Enyard apart pending the investigation. So too do various statements made in HR's report concerning the May 30 incident. According to HR's report, when Davis was interviewed about the second incident, Davis stated that when Plaintiff reported to her that Enyard was sexually harassing her, Davis "pointed out that [Plaintiff] and Enyard had signed out together the previous afternoon without incident." [130-5] at 93. And when Plaintiff was interviewed about the second incident, she stated that "she had encountered Enyard again in the hallway after lunch that day," when he was walking through the lunch room to the blower building. [130-5] at 94. When Plaintiff "reported the encounter to

Davis," Davis told Plaintiff to "begin emptying waste baskets, and directed her to begin in the blower building where she had just seen Enyard." *Id*. Plaintiff "stated that she thought it was a way for Davis and Enyard to get her alone in the blower building and push her over the railing." *Id*. This evidence undercuts Defendant's claim that it attempted to the best of its ability to keep Plaintiff and Enyard apart and working in different areas. Compare *Hetreed v. Allstate Ins. Co*., 1999 WL 311728, at *6 (N.D. Ill. May 12, 1999) (defendant employer entitled to summary judgment on plaintiff's Title VII sexual harassment claim where the record showed that when defendant gained actual knowledge of the alleged harassment, "it acted immediately to investigate [plaintiff's] allegations fully, to insure that [the alleged harasser] and [plaintiff] had no further contact, and to punish [alleged harasser]"); *Zimmerman v. Cook County Sheriff's Dep't*, 1996 WL 22977, at *5–6 (N.D. Ill. Jan. 19, 1996) (defendant employer entitled to summary judgment on plaintiff's Title VII sexual harassment claim where the record showed that the day after plaintiff complained of harassment, defendant initiated an investigation and allowed plaintiff to work from home in the interim, and transferred alleged harasser to another job location at conclusion of investigation); *Jones v. Heartland Healthcare Center*, 2017 WL 4570306, at *5–6 (C.D. Ill. July 5, 2017) (defendant employer entitled to summary judgment on plaintiff's Title VII sexual harassment claim where the record showed that the day after employer learned of the alleged harassment, it "took various steps to prevent the [alleged harasser] from coming into contact with Plaintiff").

Further, according to Defendant's Rule 56.1 statement, it took HR until May 22, 2014 to issue its report concerning the April 28 incident and until August 18, 2014 for Defendants to issue written warnings to Enyard and Plaintiff—response times that a reasonable juror might conclude were too slow given the seriousness of Plaintiff's allegations and potential risk of harm to Plaintiff

if her allegations were true. Cf. *Passananti v. Cook County*, 689 F.3d 655, 670 (7th Cir. 2012) (questions of whether county sheriff's department exercised reasonable care to prevent and correct sexual harassment, and whether a female employee unreasonably failed to take advantage of available preventative or corrective opportunities, were for the jury in the employee's Title VII suit; there was evidence that the department had adopted an appropriate policy and complaint procedure, but that in reality the policy and procedure were ignored). While Plaintiff was "promoted" and transferred to a different plant on June 4, 2014—which separated her from Enyard—this still left nearly a month-long period during which she and Enyard were working together during the pendency of HR's investigation. For these reasons, Defendant is not entitled to summary judgment on Plaintiff's hostile work environment claim.

C.      **Title VII Retaliation**

In Count III of the SAC, Plaintiff alleges that Defendant, "by its acts and/or omissions, retaliated against [her] for opposing sexual and discriminatory harassment in the terms and conditions of her employment violating the Title VII of the Civil Rights Act of 1964 and/or for participating in a Charge of Discrimination before the EEOC." [119] at 28-29. Title VII prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e–3(a); *Lord v. High Voltage Software, Inc*., 839 F.3d 556, 563 (7th Cir. 2016). On summary judgment, "[w]e must decide whether, construing all the facts in her favor, there is enough evidence to permit a reasonable jury to find that '(1) [Plaintiff] engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two.'" *Rozumalski v. W.F. Baird & Assocs., Ltd*., 937 F.3d 919, 924 (7th Cir. 2019) (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017)).

Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff lacks sufficient evidence to permit a reasonable factfinder to conclude that the multiple disciplinary actions taken against Plaintiff were prompted by a retaliatory motive. Instead, Defendant maintains that it had legitimate non-discriminatory reasons for disciplining and ultimately terminating Plaintiff, including (1) failure to clean up spills in her assigned work area, (2) threatening her supervisor, Adams, with a false allegation about him, (3) multiple counts of insubordination, including failure to complete required documents such as unexcused absence reports; being AWOL, and (4) poor work performance reviews for two consecutive years.

Based on the disputed record before it, the Court cannot say that Defendant lacked a retaliatory motive for disciplining and terminating Plaintiff. According to Plaintiff, most if not all of the alleged infractions were based on events that did not occur. Defendant acknowledges that one of the reasons Plaintiff was terminated was due to being AWOL on dates including May 21, 25, and 26, 2017. Since Plaintiff maintains that she requested and was improperly denied FMLA for those dates (as explained further below), there is a dispute concerning whether it was proper to mark Plaintiff AWOL for those dates and use that alleged infraction (among others) to suspend and ultimately terminate her. Plaintiff also disputes that she failed to clean up two spills in her assigned work area; instead, Plaintiff testified that she had already gone home at the end of her shift when the August 3, 2015 spill occurred, see [130-12] at 10, Tr. p. 27; 20, Tr. p. 70; 24, Tr. p. 88; and that both spills were caused by the negligence of male employees, see *id.* at 22, Tr. p. 79. Plaintiff also testified that when other employees caused spills, they were not disciplined. *Id.* at 21, Tr. pp. 75-77. Plaintiff further denies that she threatened her supervisor, see *id.* at 20, Tr. pp. 72-73; 24, Tr. p. 86; or that she refused to fill out required forms, *id.* All of these factual disputes preclude summary judgment on the FMLA retaliation claim. The Court cannot say based on the

record before it that Defendant would have terminated Plaintiff even absent her protected activity, and therefore must deny summary judgment on the Title VII retaliation claim.

### D. FMLA Interference

In Count IV of her complaint, Plaintiff alleges that Defendant, "by its acts and/or omissions, interfered with FMLA federal practices and procedures, resulting in multiple violations." [119] at 30. "To prevail on an FMLA-interference claim, an employee must establish the following: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Valdivia v. Township High School District 214*, 942 F.3d 395, 398 (7th Cir. 2019) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

Defendant argues that it is entitled to summary judgment on Plaintiff's FMLA interference claim to the extent it is based on Plaintiff's allegations that Defendant violated the FMLA by marking her AWOL on September 11, 2015 for absences on September 8 through 10, 2015—dates for which Plaintiff alleges she properly requested FMLA leave. See [119] at 13. The Court agrees with Defendant that this portion of Plaintiff's FMLA interference claim is time-barred. An action for violation of the FMLA "may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought," except that claims for willful violations may be brought within 3 years. 29 U.S.C. § 2617(c)(1) & (2). Plaintiff asserted her FMLA claims for the first time in her SAC, which was filed on May 9, 2019—well over three years after she was denied FMLA leave and instead marked AWOL for absences on September 8 through 10, 2015. See [119].

Defendant argues that it is entitled to summary judgment on the remainder of Plaintiff's FMLA interference claim, as well, because Plaintiff cannot establish that she was entitled to take leave; that she provided sufficient notice of her intent to take leave; or that she was denied benefits to which she was entitled. However, there are disputed questions of fact going to all of these elements, which preclude summary judgment. There is evidence that Plaintiff was entitled to take FMLA leave on the three days she was marked AWOL (May 21, 25, and 26, 2017), because Plaintiff was approved for Intermittent FMLA Medical Leave for her mother from May 20, 2017 through May 19, 2018. There also is evidence that Plaintiff requested leave for the three days she was marked AWOL, but was denied. Although other employees of Defendant testified at Plaintiff's termination hearing that she did not request FMLA leave when she called in to work on those three days, Plaintiff's testimony to the contrary creates a material question of fact. At her deposition, Plaintiff maintained that when she called in on each of the three days, she requested FLMA leave—not vacation time, and not sick time—but was told that she could not have it. See [130-12] at 58-59, Tr. pp. 139-40, 59, Tr. p. 144; see also *id.* at 59, Tr. p. 147 ("They told me I just couldn't use [FMLA]"). Plaintiff also testified that she had FMLA documentation for the three dates, which she gave to her supervisor, Michael Kavanaugh. *Id.* at 58, Tr. pp. 141-43. Again, the Court cannot assess the credibility of witness testimony on summary judgment; that is a determination that must be made by the factfinder at trial. See *Johnson*, 936 F.3d at 705–06.

### E.     FMLA Retaliation

The final claim set out in Plaintiff's SAC is for FMLA retaliation. "Retaliation claims under the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse

action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (citing *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018)).

Defendant moves for summary judgment on the FMLA retaliation claim on the basis that Plaintiff cannot establish any causal link between her taking FMLA leave and Defendant's decision to discipline and ultimately terminate her. Defendant contends that Plaintiff's termination would have occurred regardless of any request for FMLA leave due to her misconduct and poor work performance, which warranted progressive discipline of warnings, suspensions, and a 30-day suspension pending discharge. Defendant points to the Civil Service Board's determination in Plaintiff's discharge proceedings that, since Plaintiff passed probation as an MLA, she received the full gambit of disciplinary actions, with infractions including (1) failure to clean up spills in her assigned work area, (2) threatening her supervisor that she would make a false allegation about him, (3) multiple counts of insubordination, (4) refusal to complete required documents such as an Unscheduled Absence Report, and (5) being absent without leave.

For the same reasons stated above with regard to Plaintiff's Title VII retaliation claim, there are disputed questions of material fact concerning whether Defendant would have terminated Plaintiff regardless of her request for FMLA leave, which preclude summary judgment.

### F.    Punitive Damages

Defendant argues that it is entitled to summary judgment to the extent that Plaintiff requests punitive damages, because "municipalities like the District are immune from punitive damages under 42 U.S.C. § 1983." [154] at 16 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 (1981)). The Court fails to see how this argument is relevant, as Plaintiff does not assert any claims against Defendant under Section 1983; instead, she proceeds under Title VII and the FMLA. "Punitive damages are available under Title VII when a plaintiff demonstrates that the

defendant engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 437–38 (7th Cir. 2012) (quoting 42 U.S.C. § 1981a(b)(1)). However, the FMLA does not authorize the award of punitive damages. *Bell v. Illinois Dep't of Human Servs.*, 2019 WL 6726124, at *1 (N.D. Ill. Dec. 11, 2019); see also *Breneisen v. Motorola, Inc.*, 2009 WL 1759575, at *7 (N.D. Ill. June 22, 2009) ("The remedies available under the FMLA do not include damages for emotional distress or punitive damages." (internal quotation marks and citation omitted)); *Alvarez v. Hi-Temp Inc*., 2004 WL 603489, at *4 (N.D. Ill. Mar. 24, 2004) ("The remedies available under the FMLA do not include damages for emotional distress or punitive damages."). Therefore, Defendant is entitled to summary judgment in its favor to the extent that Plaintiff requests punitive damages as relief for her FMLA claim.

## IV.    Conclusion

For these reasons, Defendant's motion for summary judgment [129] is granted in part and denied in part. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's FMLA claims to the extent that Plaintiff requests punitive damages as relief for those claims and on Plaintiff's FMLA interference claim to the extent that it is based on Defendant's alleged denial of leave to Plaintiff in 2015. Defendant's motion is otherwise denied. This case is set for status hearing on May 7, 2020 at 9:30 a.m.

Dated: March 30, 2020

_____
Robert M. Dow, Jr.
United States District Judge