**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIA T. TAYLOR | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-7855 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| METROPOLITAN WATER | ) | |
| RECLAMATION DISTRICT of | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING
BENCH TRIAL IN ACCORDANCE WITH FRCP 52(a)**

## I.      INTRODUCTION

Plaintiff Tia Taylor brought this lawsuit against her former employer, Defendant Metropolitan Water Reclamation District of Chicago, in 2015.  The District is a local government unit responsible for the treatment of sewage and storm water in most of Cook County.  It operates continuously around the clock and serves several million residents.

Taylor worked as a Maintenance Laborer at the District from 2009 to 2017.  During that time, she was promoted from Class B to Class A and worked at three different locations (referred to as "plants" in the testimony).  Her duties included landscaping, maintenance, sweeping pavement, caring for floors and windows, shoveling snow, picking up refuse, and other janitorial services.  In the approximately eight years that Taylor was employed by the District, the vast majority of its employees were male.

In her operative second amended complaint [119], filed in 2019, Taylor asserts claims for (1) Title VII gender discrimination, (2) Title VII hostile work environment, (3) Title VII retaliation, (4) FMLA interference, and (5) FMLA retaliation.  In March 2020, the Court granted in part and

denied in part the District's motion for summary judgment [see 157], finding triable issues of fact on each claim listed above.

After several lawyers either withdrew from representing Taylor or otherwise abandoned the case [see 163, 206], the case proceeded to an eleven-day bench trial with Taylor representing herself. The parties agreed to file post-trial proposed findings of fact and conclusions of law. [See 244.] Taylor also filed a motion for sanctions [248], which was briefed on the same schedule. Both the court reporter and Taylor had health issues [see 281, 283] that delayed the preparation of the transcripts and the briefs. Taylor's final brief [331] was filed in late January 2024.

The Court has now reviewed all post-trial submissions, as well as the trial transcripts, documentary evidence, and its own contemporaneous notes from the trial. The Court has omitted summaries of any testimony that did not bear on its resolution of the disputed legal issues in the case. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now issues this memorandum opinion and order resolving all claims. For the reasons stated below, judgment will be entered under Federal Rule of Civil Procedure 58 in favor of the District and against Taylor on all claims. In addition, Taylor's motion for sanctions [248] is denied.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Title VII Claims

In her complaint and through her trial testimony, Taylor asserts that her supervisors violated Title VII by subjecting her to different working terms and conditions than her male counterparts, creating a hostile work environment, and retaliating against her for exercising her legal rights. Specifically, she complains that the District violated her statutory rights in the following ways: (1) assigning her the cleaning work of male co-workers, (2) denying her mileage reimbursement, (3) requiring her to fill out unexcused absence and sick reports, (4) ignoring her safety complaints, (5)

2

denying her access to a women's restroom, (6) denying her overtime, (7) denying her personal protective equipment, (8) denying her training opportunities, and (9) denying her transfer requests.

Taylor's Title VII claims implicate prohibitions on discriminatory treatment and retaliation. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also proscribes retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 20003-3(a).

In the last decade, the Seventh Circuit has clarified the legal standards for Title VII employment claims. Under our circuit's streamlined method of inquiry, the "singular question that matters in a discrimination case [is] 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016)). As the court explained in *Ortiz*, "[e]vidence is evidence." 834 F.3d at 765. While courts must consider relevant evidence and disregard irrelevant evidence, "no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The rigid application of so-called direct- and indirect-frameworks thus has no place in the Seventh Circuit, and courts have been directed to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id. Ortiz*'s clarification of the legal standards applicable to "direct" and "indirect" evidence pertains to Title VII retaliation claims as well. See *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

### 1. Gender Discrimination Claim

An employee may prove Title VII employment discrimination in different ways. See *Gamble v. FCA USA LLC*, 993 F.3d 534, 527 (7th Cir. 2021) (noting "one of the ways to prove employment discrimination"). *Ortiz* clarified that the so-called "indirect" burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a viable—though not required—method of proving gender discrimination under Title VII. See *David v. Bd. of Trs. of Cmty. Coll. Dis. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under the *McDonnell* framework, a Title VII plaintiff alleging gender-based discrimination bears the initial burden of establishing that

> (1) she is a member of a protected class, (2) she performed reasonably well on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside her protected class were treated more favorably by the employer.

*Id.* at 225 (quotation marks and alterations omitted). Under this framework, a "similarly situated employee[] must be directly comparable to the plaintiff in all material respects." *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 959 (7th Cir. 2021) (quotation marks omitted).

If a plaintiff carries her burden at this initial step and makes a *prima facie* case of discrimination, then the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 225; see also *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 932 (7th Cir. 2020) (reversing summary judgment for the employer based on the finding that the plaintiff alleging gender discrimination carried her initial burden, and a reasonable dispute of material fact existed as to whether the employer's reason for the adverse employment action was pretextual).

4

When a plaintiff alleging gender discrimination chooses not to rely on the *McDonnell* framework, that "plaintiff must prove either direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll*, 953 F.3d at 932; see *Ortiz*, 834 F.3d at 766 (applying a "straightforward" analysis to the plaintiff's discrimination claim not based on the *McDonnell* framework). A plaintiff choosing to proceed in this manner may generally rely on three broad types of circumstantial evidence to support an inference of intentional discrimination: ambiguous or suggestive comments or conduct, better treatment of those similarly situated but-for the protected characteristic, and an employer's dishonest justification for disparate treatment. *Joll*, 953 F.3d at 932. The first type of evidence "is the most common type of evidence in an intentional discrimination case." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Additionally, "[e]ach type of evidence is sufficient by itself . . . to support a judgment for the plaintiff; or they can be used together." *Id.*

At trial, Taylor did not adopt any particular approach to proving her case under the permissible methods. This is not surprising, as she was representing herself. Nor is it any way prejudicial to her case, as the *Ortiz* approach requires the Court to look at all of the relevant, admissible evidence in rendering a verdict on Taylor's claims. Upon consideration of the trial testimony and exhibits of record, the Court makes the following findings of fact and conclusions of law as to Taylor's Title VII claims gender discrimination claims:

### a.     Assignments

Taylor first complains about receiving extra assignments—essentially, being forced to work harder than her male colleagues for the same pay. Taylor's principal supervisor, Laborer Foreman Hollee Davis, credibly testified at trial that she assigned work equally to both sexes and that all employees had to do double assignments when the section was short staffed. Tr. 227, 234,

265, 276-77, 285. Another employee noted that the Calumet plant was generally understaffed at times and workers consequently had large areas to clean. Tr. 1594-95.

The Court infers from the testimony that, at times, Taylor (and her co-workers) were given tasks beyond their regularly assigned duties to ensure that plant maintenance was adequately completed each day, regardless of temporary or long-term absences. Yet, there is no corroboration for Taylor's contention that any extra work she was assigned came her way on account of her gender. Moreover, the Court does not recall seeing any business records that document the daily assignment regimen at any of the plants where Taylor worked. Such records might have supported her theory that District supervisors assigned work lopsidedly. On the basis of the record as a whole, the Court finds that Taylor has not shown by a preponderance of the evidence that she received unfair work assignments on the basis of her gender.

### b. Mileage reimbursements

Taylor next claims that she was denied mileage reimbursement for compensable driving undertaken in her personal vehicle while working at the District's Calumet plant. The trial testimony established that these drives took place within the geographic confines of the plant and thus amounted to only a few dollars a day. Tr. 196. Davis testified credibly that Taylor never submitted the proper forms to request these reimbursements. Tr. 266-67. Taylor offered no corroborating evidence that she did submit the forms. As a matter of common sense, there is no reason why a public agency would cheat an employee out of such small amounts of money. Moreover, the District produced copious quantities of materials from their files in discovery. If evidence of unfilled reimbursement requests existed, Taylor would have presented it at trial. The more plausible inference to be drawn from the totality of the evidence is not that the District

refused to honor Taylor's requested reimbursements. Rather, it seems that Taylor did not complete the paperwork. The Court therefore concludes that Taylor has not substantiated this claim.

### c.      Unexcused absence and sick reports

Taylor also asserts that she was treated differently (and less favorably) than male employees in regard to the administrative task of submitting unexcused absence and sick leave reports. Top level administrators for the District testified to the procedures under the Collective Bargaining Agreement for documenting absences, which applied whether the employee is sick or merely seeking an unscheduled absence of another reason. Tr. 932-33. The testimony from one of Taylor's supervisors indicates that it is common for employees to fill out these forms and for supervisors to require them but suggests that neither compliance nor enforcement is universal. Tr. 1449-50. Nevertheless, the District presented evidence that at least one male employee was disciplined for refusing to complete an unscheduled absence form. Tr. 1449, 2010-12. Given that evidence and the plain terms of the collective bargaining agreement, Taylor has not convincingly established gender-based discrimination based on the District's enforcement of her obligations to submit these forms.

### d.      Safety complaints

Taylor asserted in her complaint and testified at trial that some of her supervisors ignored safety concerns that she raised from time-to-time. Supervisors Lockett and Stinson both testified to the contrary. Tr. 1115-16, 1559-60. Not surprisingly, those complaints do not appear to have been well documented. But even if the District was at times slow to address Taylor's safety concerns, Taylor has not tied any of those alleged shortcomings to discrimination on the basis of gender. In other words, there is no basis for concluding that the District's supervisors and managers disregarded safety concerns because of Taylor's gender.

### e.    Women's restroom

Taylor complained about access to a women's restroom. However, the evidence at trial revealed that Taylor left her key in the restroom door (Tr. 575, 704, 2134-36) and that once she lost her key, the lock was removed (Tr. 1112-14). Her access to the women's restroom does not appear to have been curtailed at all, much less on account of her gender.

### f.    Overtime

Taylor claimed that while she was working at the Stickney plant, she did not have the same opportunities to work overtime as male co-workers. The District successfully refuted this claim at trial, introducing evidence that its HR department investigated Taylor's contention and determined that she had the second highest number of overtime hours in her section. Tr. 527-28. Two Stickney supervisors credibly testified that they did not skip Taylor when it came to assigning overtime hours and treated all employees, both male and female, equally in that regard. Tr. 1444-45, 1564.

### g.    PPE

The evidence at trial showed that employees needed to have the proper personal protective equipment for their jobs, which involved the management of waste and often required them to work outside in adverse weather conditions. There is no dispute that, at times, Taylor needed access to this equipment. But the only testimony concerning specific PPE that was not supplied in a timely manner related to Taylor's request for gloves. And the only testimony concerning that request attributed the delay not to animus of any kind, but rather to a temporary lack of supply in her size. Tr. 826-27. Multiple Stickney plant employees testified without contradiction that gloves in Taylor's size were ordered and supplied once the issue was called to their attention. Tr. 1114, 1417, 2139. Any shortcomings by the District in regard to PPE have not been shown to be the result of gender discrimination.

### h.     Training

Taylor's complaints about disparate treatment in training vis-à-vis male employees were refuted by Supervisors Lockett and Adams, both of whom testified that Taylor received the same peer-to-peer training as the male laborers.  Tr. 825-26, 1547.  Notably, Taylor was not able to point to any specific task for which she was inadequately trained, and she managed to work for many years at various locations in the District with satisfactory reviews, suggesting that she was trained well enough to perform the tasks assigned to her.  Furthermore, many of the shortcomings in Taylor's performance that emerged in Taylor's later years —at least as perceived and documented by her supervisors — had more to do with conflicts with co-workers and attendance issues than with day-to-day performance of assigned duties.

### i.     Transfer and Promotion

In November 2013, Taylor submitted a request to transfer to another plant.  Tr. 329-30. However, due to a clerical error by Taylor — she submitted an "unrepresented" employee form when she was a "represented" employee under the union contract — her complete application was not submitted in time and another employee was given the transfer she sought.

The record is clear and undisputed that Taylor received an erroneous promotion in May 2014.  Tr. 446.  As the evidence shows, the District at first used an incorrect seniority date in determining that Taylor should be promoted.  The mistake was corrected quickly and the offer rescinded.  Tr. 333, 930-31.  Less than a month later, Taylor did receive a promotion to the position of MLA as of June 4, 2014.  DX 36.  The upshot is that Taylor's transfer did not go through for non-discriminatory reasons, and the District properly handled her promotion in 2014.

### 2. Hostile Work Environment Claims

"Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). For purposes of Title VII, a workplace is hostile "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Scairfe v. U.S. Dep't of Veteran's Affairs*, 49 F.4th 1109, 1115 (7th Cir. 2022) (alteration and quotation marks omitted). A plaintiff claiming she was subject to a hostile work environment because of her gender "must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.*

Regarding the second factor, a plaintiff alleging a gender-based hostile work environment claim need not allege that the complained-of conduct consisted "'of pressure for sex, intimate touching, or a barrage of sexual comments,' [but] the 'demeaning, ostracizing, or even terrorizing' conduct must still be related to gender." *Scaife*, 49 F.4th at 1115 (quoting *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018)). The court may consider whether the complained-of conduct was directed at both men and women in determining whether the harassment was based on membership in a protected class. See *id.* at 1117 (rejecting the plaintiff's gender-based hostile work environment claim because the record reflected that the supervisor's unsavory conduct was directed at men and women alike); see also *Scruggs v. Garst Seed Co.*, 587 F.3d 1176, 1179 (7th Cir. 2009) (holding employer's allegedly hostile comments were not gender-based because they were directed to male and female employees).

On the third factor, courts look to the totality of the circumstances when determining whether conduct is severe or pervasive, and factors for consideration include the following:

> (1) the frequency of discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with the employee's work performance; and (5) whether it is directed at the victim.

*Scaife*, 49 F.4th at 1115.

On the fourth factor, "Title VII does not demand employers be held vicariously liable for hostile work environments created by their supervisors unless [they are] accompanied by an adverse employment action." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627 (7th Cir. 2019).

Taylor asserts Title VII hostile work environment claims arising out of her treatment by Laborer Foreman Hollee Davis, who is alleged to have denied Taylor gas mileage reimbursement, made negative comments about Taylor's appearance, given Taylor looks of disgust, and treated Taylor differently with respect to work assignments. Although Davis did give assignments to Taylor and could administer oral and written warnings to the MLBs she managed, she testified credibly that she lacked the authority to hire, fire, promote, or suspend employees. Tr. 258-59. Davis testified that she and Taylor got along fine. Tr. 275-76. During the first two years that Davis supervised Taylor, Davis gave Taylor "meets standards" ratings and Taylor received a promotion. Tr. 271-73. Other employees who testified at trial found Davis to be a fair supervisor who treated male and female employees the same. Tr. 1018-19, 1595.

In 2013, Taylor initiated a claim of harassment against Davis. The District's HR department conducted an investigation which included interviews of Davis and Taylor, plus Davis' supervisor, as well as a review of work log assignments in the area in which both women worked. Tr. 477-85. The upshot of the investigation was a finding of no discrimination or harassment, but

a recommendation that the workloads of both Taylor and a male MLB, Franklin Enyard, be reduced. Tr. 386.

The Court cannot find any fault with the District's investigation or its conclusions, nor can it see any basis from which to conclude that Davis' supervision of Taylor created a hostile work environment or violated Title VII in any other respect.

In her complaint, Taylor also lodged serious charges against co-worker Enyard, claiming that he subjected her to sexually abusive language and threatened to kill her following an altercation over a motorized cart in April 2014. Enyard had taken the cart that morning. Tr. 1023. Taylor located Enyard working in the men's room of the digester building and demanded the cart. Tr. 1023-25. Enyard refused, precipitating a verbal altercation, the details of which are disputed. Tr. 309-10, 563-616, 621-61, 970-1011, 1020, 1040-41. According to Taylor's complaint, Enyard called her a "bitch," made a sexually explicit threat, and threatened to kill her. Enyard denied all of those allegations, as well as a charge that he chest bumped her and blocked her from leaving the building, though he acknowledged the verbal dispute.

The trial record includes police reports on the date of the cart dispute as well as a detailed HR investigation. HR concluded that Taylor instigated the incident and found no evidence to support or substantiate Taylor's allegations about physical conduct, sexual threats, or any threat to kill her. Tr. 470-73. HR noted that Taylor did not mention the death threat in her first contact with supervisors and other colleagues and the police lieutenant's statement that Taylor never mentioned such a threat and in fact was calm and felt safe to return to work later that afternoon. *Id*. Both behaved unacceptably in the workplace; both were issued warnings; supervisors were urged to separate the two as much as possible.

### 3. Retaliation Claim

To prove a retaliation claim, "the plaintiff must prove that [s]he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). A plaintiff must show that any allegedly adverse employment action was one "that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lesiv*, 39 F.4th at 911–912 (quotation marks omitted). This standard is lower than that imposed on plaintiffs asserting Title VII discrimination claims. *Id.* at 911.

A plaintiff asserting a retaliation claim must demonstrate that the employer had actual knowledge of the plaintiff's protected activity. *Lesiv*, 39 F.4th at 915. And, in the context of a retaliation claim, proof of causation requires that the plaintiff show but-for causation. *Id.* "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Additionally, a plaintiff may point to suspicious timing to substantiate the causation aspect of her retaliation claim, though suspicious timing alone will rarely support such a claim. *Id.*; see also *Igasaki*, 988 F.3d at 959 ("For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action."). If a plaintiff fails to show retaliation based on suspicious timing, then the plaintiff must point to "other evidence that supports the inference of a causal link." See *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (holding that the plaintiff failed to show but-for causation to support his retaliation claim based on suspicious timing or any other evidence). If a plaintiff successfully establishes evidence of a retaliatory motive, "the employer may show that the employee would have been fired even absent his

13

complaints about harassment." *Lord*, 839 F.3d at 564. When an employer makes such a showing, "then the alleged retaliatory motive, even if unchallenged, was not a but-for cause of [the plaintiff's] harm." *Id.* at 564 (quotation marks and alteration omitted).

Taylor's Title VII retaliation claim fails because she presented no persuasive evidence of any link between an adverse employment action and her statutorily protected activities. The District acknowledges that Taylor's filing of an EEOC charge and this lawsuit constitute statutorily protected activities and that her suspensions and termination qualify as materially adverse actions. To be sure, Taylor's discipline started more than two years (January 2012) before she filed either her EEOC charge (July 2014) or her lawsuit (September 2015). Moreover, the District carefully documented each instance in which it imposed progressive discipline on Taylor and it did so according to both union and district policies. Each consequence to Taylor (warning, suspension, etc.) followed from an infraction that undermines any argument that she was performing her job satisfactorily in any event. See *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007). And if she were to argue that the consequences were too severe for the infractions, she did not identify any employee who engaged in similar policy transgressions who received different or better treatment. *Id*. at 786. Nor can Taylor convincingly argue that the District's discipline was imposed as a pretext for retaliation. Had Taylor felt that the reason given for any of the adverse actions against her (e.g., tardiness, insubordination, etc.) was unjustified, she could have availed herself of the employee grievance process and perhaps made a record of unjustified or unjustifiable retaliation. There is nothing to support such a contention here.

### B.    FMLA Claims

The FMLA requires employers to allow employees to take up to twelve weeks of unpaid leave for particular qualifying events during any twelve-month period. See 29 U.S.C. § 2612(a).

Employers are prevented from interfering with, discriminating against, or retaliating against an employee's exercise of this statutory right. 29 U.S.C. § 2615.

### 1. FMLA Interference Claim

An employee alleging interference under the FMLA "must prove that [s]he was denied a right to which [s]he was entitled; proof of discriminatory intent is not required." *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023). An employee claiming FMLA interference must establish the following elements:

> (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of his intent to take leave; and (5) her employer interfered with, restrained, or denied FMLA benefits to which he was entitled.

*Id.* (quotation marks omitted).

Taylor's FMLA claims revolve around a handful of days in May 2017. Taylor believes that the District wrongfully refused to give her FMLA leave on those dates. The record is fairly complicated despite the fact that, in the end, only three days (May 21, 25, and 26) are at issue.

To begin, it is worth noting that in her eight years of employment at the District, Taylor took 954.5 hours of FMLA leave. DX 62C. Plainly, she was familiar with the process and had successfully navigated it on several occasions. Among the many trial witnesses was Robin Felton, a District employee who served as FMLA coordinator and worked with employees, including Taylor, on the required paperwork to process FMLA leave requests.

On April 17, 2017, Taylor requested intermittent FMLA leave so that she could care for her mother. Felton sent Taylor the paperwork. Tr. 1337. Felton returned Taylor's initial application because the certifying doctor wrote "unknown" in response to a question on the form and a more definite answer was needed to determine the parameters of the allowable leave. Tr. 1334-38.

Unfortunately for Taylor, the revised medical certification identified the time period for intermittent FMLA leave to run from June 2, 2017, to June 1, 2018.  DX 55.  No FMLA request was certified for any dates in May 2017.  Thus, Taylor's medical certification did not place the District on notice of Taylor' intent to have her absences on May 21, 25, or 26 counted as FMLA leave hours.

Taylor was late to or absent from work on several days during the period from May 14 to 26.  On May 14, she overslept and missed 4.25 hours of her shift.  Tr. 637.  This absence was determined to be a "no call, no show," which triggered a directive from her section supervisor that Taylor could not be approved for discretionary time off (vacation or earned holiday time) until she had an investigative meeting regarding the "AWOL" absence on May 14.  Tr. 2015-18.

On May 19, Taylor requested by phone a vacation day in lieu of reporting for her scheduled shift on May 20.  Tr. 1453-55.  The individual with whom she spoke advised that he could not approve the vacation day until Taylor met with her supervisors.  Tr. 1455-56.  Taylor then requested sick time, which was approved.  Tr. 1457-58.  Taylor mentioned her FMLA application in connection with her conversations about getting the day off on May 20, but did not tie that application to the request to take that specific day off.  Tr. 1456.  To the contrary, she sought first to use vacation time and then sick leave.  Taylor missed a shift on May 21 as well.

Taylor also missed work on May 25 and 26.  Tr. 715-18.  Prior to the May 25 absence, she first asked for a vacation day, which was denied on the same basis as above because the meeting with supervisors had not taken place.  Ultimately, she took off May 25 and 26 as sick days.  Tr. 716-18.  There is no record of Taylor asking for FMLA leave on either of those days.

When Taylor reported to work for her May 27 shift, she met with her supervisors, who asked for an explanation of her absences on May 20, 21, 25, and 26.  Tr. 1441.  The notes of this

"investigation meeting," as well as the trial testimony, show that Taylor had very little to say in her defense. Tr. 1441; DX 58. Notably for present purposes, the record is devoid of any contemporaneous mention that Taylor wanted those days to be counted toward her FMLA leave or that she had any basis for making such a request — i.e., that she was intermittently caring for her mother on those days. In short, Taylor's conversation with her supervisors neither dispelled their concerns about her reliability as an employee (which might have given them less reason to consider discipline under the District's rules and Taylor's union contract) nor provided any reason to include those absences within her FMLA leave.

To be sure, the District ultimately did credit the May 20 absence to FMLA leave because she mentioned her application in the May 19 phone call about the absence. Tr. 1626; DX 9. The other absences were unexcused and resulted in a five-day suspension, which Taylor did not appeal. Tr. 1625; DX 25.

Could the District have retroactively excused these absences or included them in Taylor's FMLA leave? While there does not appear to be any legal impediment to exercising that kind of lenity — indeed, the District appears to have given Taylor the benefit of the doubt as to the May 20 absence — the District cites policy reasons, including consistent application of its rules, as reasons not to make exceptions. One can argue both sides of that debate as a policy matter, but the Court cannot find any basis in the law or the District's policies and practices that would justify overruling the District's exercise of discretion in this instance. In short, the District had no legal *obligation* to cut Taylor a break on the record presented at trial. To be sure, if Taylor wanted the May dates to have been included in her FMLA leave, she may have been the victim of an oversight by her and/or her doctor, as the form that she submitted to the District indicated that the care for Taylor's mother would begin on June 2. In the end, the manner in which the revised form was

17

completed actually signaled to the District that Taylor was *not* seeking FMLA leave for any dates in May. Accordingly, Taylor has not carried her burden of demonstrating an entitlement to FMLA leave on any of the three May dates (21, 25, of 26) in question.

Furthermore, Taylor did herself no favors by providing a less than fulsome accounting of her circumstances when she met with her supervisors on May 27. Nothing in the record indicates that she mentioned FMLA, her mother's situation, or made any request for them to work with her through a difficult time. Perhaps the overall relationship between employer and supervisors had deteriorated to the point where she did not feel comfortable providing such details. In any event, Taylor's written and oral communications with the District fell short of providing notice of any contemporaneous intent to take the May 21, 25, or 26 dates as FMLA leave.

### 2. FMLA Retaliation Claim

A plaintiff seeking to prevail on a retaliation claim under the FMLA must show: "(1) that he engaged in FMLA-protected activity; (2) that his employer took an adverse employment action against him; and (3) there is a causal connection between the two." *Juday*, 57 F.4th at 596. A plaintiff must establish discriminatory intent on the part of the employer, or, put another way, provide "'evidence that the employer was acting under a prohibited animus.'" *Id.* (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009)). In *Juday*, where the plaintiff proceeded under the direct method of proof, the court determined that the plaintiff's "retaliation claim fail[ed] for the same reason as his interference claim"—namely, that the employer had an honest suspicion that the plaintiff "had violated the company's rules against providing false or misleading information in connection with his FMLA leave." *Id.* The court concluded that the plaintiff failed to produce evidence that the employer took disciplinary action against him for a retaliatory purpose rather than for his FMLA abuse, and so the employee's FMLA retaliation claim failed. *Id.*

Taylor's FMLA retaliation claim fails for the simple reason that she did not prove the District denied her any FMLA benefits to which she was entitled. Nor did Taylor show a causal connection between her FMLA leave requests and the adverse employment actions taken by the District in 2017 leading to her suspension and termination. By that time, Taylor's annual reviews had declined; she had been found insubordinate; and she had other infractions including oversleeping and not showing up for work on certain dates. Finally, as with her Title VII retaliation claim, she has not shown that the District treated a comparator better. See *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014).

C.     **Taylor's Motion for Sanctions**

Taylor has also filed a motion for sanctions [248] in which she asserts that the District failed to turn over certain documents in discovery and altered certain documents that were produced and/or introduced at trial. As Taylor notes, a district court may impose sanctions for litigation misconduct — including for egregious discovery violations — if it finds that the offending party engaged in "bad faith, designed to obstruct the judicial process, or a violation of a court order." *Fuery v. City of Chicago*, 900 F.3d 450, 463-64 (7th Cir. 2018). But Taylor has not met that standard.

As to any alleged discovery violations, the time for raising those had long passed by the time Taylor, representing herself, filed the instant motion. Discovery was open for 15 months. In the interest of efficiency, the Court opened a referral to Magistrate Judge Kim for discovery supervision. During much of the discovery process, including at the end of it, Taylor was represented by counsel. True, her penultimate lawyer abandoned the case, which set back the progress of this matter to the detriment of Taylor, the District, and the Court. But another lawyer subsequently filed an appearance. That lawyer asked the Court to reopen discovery and had every

opportunity to bring to the Court's attention any possible discovery violations at that time. If a violation were shown to have occurred, the argument for reopening discovery would have been more compelling.

Waiting until trial to bring discovery motions is not a wise litigation strategy—and all the more so here, where the pandemic and the summary judgment phase of the case resulted in a lengthy gap between the close of discovery and the actual trial date. Discovery lasted long enough in this case and Taylor had every opportunity to raise any issues with the District's production of documents. To the extent that her sanctions motion relates to any alleged discovery abuses, it comes too late to be considered.

Taylor also claimed during trial, and reiterates in her motion, that the District altered certain documents introduced as evidence at trial. These are serious allegations which, if proven, could have drastic consequences for licensed attorneys such as counsel for the District. Both at trial and now on post-trial examination of the exhibits, the Court has not discerned any basis for finding the allegations to be true. Some of the documents have markings on them that Taylor claims were not on the originals. The District represents that all documents were produced as they were found in its files and that many contained handwritten notes or edits. Taylor has provided no basis for the Court to dispute the District's representation. To the extent that any markings or edits on documents raised questions or suspicions in Taylor's mind, she should have brought those concerns to Magistrate Judge Kim's attention at the time the documents were produced.

In any event, Taylor and counsel for the District had every opportunity at trial to explore every document in detail. The Court placed no limits on each side's presentation of evidence and Taylor took well over a week to present her case-in-chief. At no point did the Court identify any questionable conduct by either side in respect to the documentary evidence in the record.

20

Case: 1:15-cv-07855 Document #: 336 Filed: 08/21/24 Page 21 of 21 PageID #:9617

For all of these reasons, Taylor's motion for sanctions based on the alleged misconduct of the District's lawyers during discovery and at trial is denied.

## III.     CONCLUSION

For the reasons stated above, the Court enters the forgoing findings of fact and conclusions of law, see Fed. R. Civ. P. 52(a), finding in favor of the District and against Taylor on all of Taylor's Title VII and FMLA claims. A final judgment to that effect will be entered on the docket as required by Federal Rule of Civil Procedure 58. Civil case terminated.


Dated: August 21, 2024

_____
Robert M. Dow, Jr.
United States District Judge

21